IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 12, 2014

**ANTHONY WILLIAMS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2004C1867     Seth W. Norman, Judge**

**No. M2013-00862-CCA-R3-PC - Filed March 13, 2014**

A Davidson County jury convicted the Petitioner, Anthony Williams, of first degree
premeditated murder, aggravated assault, and felony reckless endangerment. The trial court
ordered a total effective sentence of life imprisonment plus six years. The Petitioner
appealed, and this Court affirmed the judgments of the trial court. *State v. Anthony Williams*,
No. M2007-01385-CCA-R3-CD, 2009 WL 564231 (Tenn. Crim. App., at Nashville, Mar.
5, 2009) *perm. app. denied* (Tenn. Aug. 17, 2009). The Petitioner filed a petition for post-
conviction relief, which the post-conviction court denied after a hearing. On appeal, the
Petitioner contends that the post-conviction court erred when it dismissed his petition
because he received the ineffective assistance of counsel. After a thorough review of the
record and applicable law, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JERRY L. SMITH
and JEFFREY S. BIVINS, JJ., joined.

Jason Chaffin, Nashville, Tennessee, for the appellant, Anthony Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Jennifer L. Smith, Deputy Attorney
General; Victor S. Johnson, III, District Attorney General; Dan Hamm, Assistant District
Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**
**A. Trial**

This case arises from the shooting death of the victim, George Sutherland. Based on

the Petitioner's role in the shooting, a Davidson County grand jury indicted the Petitioner for first degree premeditated murder, felony aggravated assault, and felony reckless endangerment. On direct appeal, this Court summarized the underlying facts of the case as follows:

> The homicide at issue in this appeal occurred on the evening of April 7, 2004, outside an apartment located at 300 Settle Court in Nashville. On that evening, a group of friends visited Precious Williams, the apartment's occupant. The group included: Williams's cousin, Anthony Boyce; Boyce's cousin, Marco Teasley; Peter Batiste; Henry Dodson; and the victim, George Sutherland. According to Boyce, everyone gathered briefly on the porch and then entered the apartment to play a video game.

> After dark, around 8:00 P.M., Boyce, Teasley, Batiste, and the victim stepped onto the porch "to get some fresh air." Soon, brothers Mario and Desmon Robinson, who appeared unarmed, approached the group. Boyce described the tension that soon arose: "Mario began to say something and I was like, [']what is you talking about['], you feel me[?][A]nd my cousin was saying the same thing. [']Man, why you-all coming down here with that bull-[jive?']" As the argument began, the victim went back into the apartment, leaving Boyce, Batiste, and Teasley on the porch with the Robinson brothers. Within a matter of seconds, Batiste suddenly ran from the porch, and Boyce realized that the [Petitioner] was approaching from behind the Robinson brothers while carrying a rifle in an "upward" position. Boyce immediately ran to a breezeway "two doors away" from the apartment.

> As Boyce ran, he looked behind him and realized that Teasley remained on the porch and was fighting with the Robinson brothers. After he reached the breezeway, Boyce observed the [Petitioner] standing a short distance from the porch with his gun aimed toward the apartment. The [Petitioner] then fired multiple shots in rapid secession [sic], while fire and smoke emerged from the rifle. Boyce testified that, having previously been shot with a shotgun, he would recognize the sound of a shotgun discharging and that the shots he heard were not from a shotgun. He insisted that the shots were "continual" and without a pause. Because Boyce could not see the apartment door from the breezeway, he did not know whom the [Petitioner] had shot.

> After the firing ceased, Boyce saw [the Petitioner] and the Robinson brothers running from the apartment. The [Petitioner] was slightly behind the brothers, which allowed Boyce to see that the [Petitioner] still had the rifle.

2

Boyce ran back to the porch, where he found the victim lying face-up, bleeding, in the doorway. The victim appeared to Boyce to be conscious, because he attempted to respond to Boyce's questions, but Boyce could not understand the victim's responses.

When police arrived, Boyce told them what he observed. He explained that he knew the [Petitioner] by only his nickname, "AWOL." Two days later, on April 9, the police showed Boyce a series of photographs, and Boyce identified the [Petitioner's] photograph as the person who fired the gun towards the apartment.

On cross-examination, Boyce testified that he had known the victim "all his life" and that the victim was "like a brother" to him. He said, "[W]hen we [were] young we used to run wild, but as we got older things began to get different . . . . [W]e began to start working, . . . we all had a family. But he was . . . away from what the crowd was . . . . [H]e . . . just lived a solid life . . . ."

Boyce testified the group visiting Williams was neither drinking nor using drugs the night of the shooting. He explained he did not tell the police Henry Dodson was present during the shooting because, although he knew Dodson, he never noticed him during the shooting. Boyce recalled that, because the Robinson brothers kept their hands in their jacket pockets, he believed and later reported to police that the brothers were carrying guns when they arrived at the apartment.

Concerning the nature of the argument between the Robinsons and Teasley, Boyce elaborated only that it was not "a big argument, but . . . they had some beef with [the group] or something." He recalled that, after Batiste ran from the porch, he did not see Batiste again that night. Boyce testified that Teasley, who was unarmed, fought with the Robinson brothers while he hid. He explained that he did not hear shots fired for at least one minute and perhaps as many as five minutes after he took cover in the breezeway. Boyce explained that, after he attempted to communicate with the victim, he waited nearby until police arrived and questioned him.

Marco Teasley testified that he was present at the shooting. Teasley said that the Robinson brothers approached the group gathered on Williams's porch, and the [Petitioner] arrived shortly thereafter, carrying a rifle. He explained that, although the [Petitioner's] arrival prompted everyone else to

3

flee, he remained on the porch because "[he] didn't want to run, [he] had to fight."

Teasley recounted how, after he and the Robinson brothers "[had] words" on the porch, Desmon Robinson hit Teasley in the mouth, knocking out a tooth, which was later collected by police. Teasley then took off his jacket and "grabbed one of them." While Teasley and the Robinsons fought, the [Petitioner] stood at the end of a nearby fence, holding his rifle. At some point during the confrontation the [Petitioner] pointed his rifle at Teasley and instructed Desmon Robinson to "'get out of the way.'" Teasley testified that he was scared and that he feared for his life when the [Petitioner] pointed the rifle at him and told Desmon to get out of the way.

Teasley testified that, in order to shield himself from the rifle the [Petitioner] aimed at him, he tried to "put [the Robinson brothers] in the middle." Teasley then tried to enter the apartment and, finding it locked, knocked on its door. Unable to enter the apartment, Teasley retreated to a nearby stairwell where the Robinson brothers pursued him. Shortly after retreating to the stairs, Teasley heard two sets of three shots each. Teasley identified the shots as semi-automatic weapon fire. He explained that the Robinson brothers fled after the first set of three shots was fired. Teasley recalled that, by the end of the fight, both his hand and his mouth were bleeding.

After the assailants fled, and people within the apartment came outside, Teasley emerged and found the victim "just laying on the ground," face-up, with his legs buckled underneath his body. Teasley believed that at least one child was inside the apartment during the shooting. The day of the shooting, Teasley gave police a statement about the shooting. Two days later, police showed Teasley a photo line-up, and Teasley identified the [Petitioner] as the shooter.

On cross-examination, Teasley elaborated that he, the victim, Boyce, Batiste, and Dodson gathered on the porch before the confrontation began. Teasley and Dodson were discussing Teasley's lawnmower and music album. Teasley reiterated everyone fled once the [Petitioner] arrived with a "black and short" gun, and he said the victim went inside the apartment when the confrontation began and that Dodson never injected himself into the fight. Teasley had known the Robinson brothers, who he thought were unarmed, for at least three years before the shooting. He testified that, during the

4

confrontation, the [Petitioner], with whom Teasley was also acquainted, stood about twelve feet from the porch and never approached the porch. Teasley estimated that the confrontation lasted about ten minutes. Teasley testified that he never saw the victim with a gun, either before or after the shooting. He explained that the steps under which he retreated were about six feet from the apartment door.

Teasley acknowledged that, when he spoke with the police the day of the shooting, he told them that he had not recognized the assailants. He admitted that this statement was untrue, but he explained that he denied knowledge of the assailants' identities "because it was the first day, [and he] didn't know [what was] going to happen." Teasley had known the victim for at least nine years before the shooting. Teasley explained that, at trial, he was willing to truthfully testify not only because the victim had died but also because he was under subpoena. He said that, had the victim survived the shooting, he probably would have identified the assailants "if the victim wanted [him] to tell." On re-direct examination, Teasley emphasized that, although he untruthfully denied recognizing the assailants, he gave an otherwise truthful and complete account of the shooting when he spoke with police the evening of the shooting.

Precious Williams testified she lived at the apartment involved in this shooting and gave the following account of the events leading up to the shooting: Williams testified she, the victim, Teasley, Rico Murry (Williams's boyfriend), "James" (Williams's friend), "Lacresha" (Williams's friend), and Jasmine (Williams's "little girl") convened at her apartment on April 7, 2004. As she and several of her visitors played a computer game inside her apartment, she heard a noise at her door, which she described as a "bump." Alarmed, she emerged from her apartment to find Teasley fighting with the Robinson brothers, each of whom she knew. She asked them "to stop fighting because it wasn't worth it." During the scuffle, which she estimated to have lasted between three and five minutes, Williams saw the [Petitioner] waiving [sic] a rifle toward the scuffle while he stood on a brick a short distance down the sidewalk.

As Williams stood outside her apartment attempting to find cover, she heard her apartment's screen door slam as though someone had come outside, immediately after which she heard the sound of "more than ten" shots being fired. From where she stood, Williams could see neither who had exited her apartment nor, immediately, who had been shot. Williams never saw the

5

[Petitioner] fire his gun. Williams merely saw "[the [Petitioner]] with the gun, fanning the gun, and [she] heard the gun go off and [she] ran." Williams ran back up the sidewalk to her apartment after she no longer heard gunfire. As she ran, Williams saw the three men run from her porch, and one of the assailants stopped briefly to pick up a gun lying on her porch.

When Williams reached her porch, she found the victim, who appeared to have been shot. She knocked on her apartment door, and Murray let her in, helped pull the victim's body inside the apartment, and called the police. Williams testified that she was hysterical, in shock, and crying while they waited for police to arrive. She confirmed that, when the police showed her a photo lineup, she identified the [Petitioner] as the person who shot the victim.

On cross-examination, Williams emphasized that, when she heard a "bump" on her door, she immediately went outside where she saw only Teasley and the three assailants. Williams described the [Petitioner's] gun as "black, [with] a long clip in it, like . . . a banana clip . . . . [K]ind of long in the front" and said neither of the Robinsons appeared to have a gun. She explained that, after the gunfire began, she ran away from the [Petitioner]. Williams returned only after the gunfire ceased. As Williams neared her porch, she did not see Teasley, but she did see a three-foot long shotgun lying on her porch. However, as she testified on direct, one of the assailants picked up the shotgun before he and the other assailants fled. She clarified that the victim was propped up against her door when she found him.

Rico Murray testified that he was present at this shooting, stating that he went to Williams's apartment after he got off work on April 7, 2004. He said he was friends with the victim, and he gave the following account of what he observed from inside Williams's apartment: Murray testified that, when he was playing a computer game inside the apartment, only a friend he identified as "Mr. Ensley" and Williams's daughter, Jasmine, were inside the apartment. He did not know whether the victim entered the apartment at any time that evening. While playing the game, Murray became aware that "a lot of confusion . . . was going on outside," and he soon heard a short series of rapidly fired shots, which he described as semi-automatic gunfire. Murray immediately dropped to the floor, and Mr. Ensley placed Jasmine between a couch and a wall and covered her with his body.

After the shots ceased, and Murray heard someone knocking on the

6

door, Murray opened the door, which caused the victim's body to fall, face-up, backwards over the threshold and partially into the apartment. Murray called 911 after he saw that the victim was bleeding and appeared unable to move. Although Murray tried to keep the victim awake while waiting for the police, the victim's speech was unintelligible, and his eyes periodically rolled back into his head.

On cross-examination, Murray explained that, after he arrived at the apartment from work, he did not emerge from the apartment until after the shooting. He conceded that, because he was able to open the door without releasing the lock, the apartment door might not have been locked . Also, he clarified that the victim appeared to have been standing, with Williams's aid, against the door before he opened it. After police arrived, Murray left the apartment to survey the scene, and he did not see a shotgun.

Peter Batiste testified he was present at this shooting and gave the following account: Batiste testified that, while he spoke with the victim, and Teasley and Boyce chatted nearby, a group of three men approached the apartment. Batiste said that he recognized [the] first two men as the Robinson brothers but that he did not recognize the man that lingered a short distance behind and carried a gun. Batiste emphasized that, although he knew the [Petitioner] at the time of the shooting, he could not identify the armed man as the [Petitioner]. As the Robinsons began to argue with Teasley, Batiste saw the victim enter the apartment.

Batiste recalled that, once the confrontation had become "a real big fist fight," the victim reemerged from the apartment. He initially testified that the victim was not carrying a shotgun when he re-emerged and that he saw the shotgun lying on the ground very near the door only after the shooting. However, Batiste acknowledged he told a detective hired by the [Petitioner] that he saw the victim holding a shotgun but insisted he did not tell the investigator that the [Petitioner] had fired the gun. Batiste then testified that the victim was armed with a shotgun when he emerged from the apartment.

Batiste further testified that, when the Robinsons and Teasley started to "throw punches," he and Boyce fled in the same direction. In later testimony, however, Batiste stated that he fled because the victim emerged with a shotgun. Batiste took cover in a nearby breezeway, where he soon heard a short round of gunfire. Batiste said that, after the shots ceased, he and Boyce returned to the porch, where Batiste saw the victim lying on the ground

and the shotgun lying nearby.

On cross-examination, Batiste reiterated that he was familiar with the [Petitioner] and expressed certainty that the armed man behind the Robinson brothers was not the [Petitioner]. Batiste testified again that the victim carried a shotgun as he emerged from the apartment. However, he emphasized that the victim neither aimed nor fired the shotgun. Batiste acknowledged that he had prior convictions for selling a counterfeit controlled substance, selling a controlled substance, and aggravated assault.

Batiste did not recall whether he identified the [Petitioner] as the armed man in the account of the shooting he gave the [Petitioner's] private detective. Explaining why he may have said the [Petitioner] was the armed man lingering behind the Robinsons, Batiste said, "I could have said something just to really throw them off because they [were] really harassing me," and explained, "I could have shot [the detective] anything to get [the detective] away from him."

Because Henry Dodson was unavailable to testify, his deposition was read into evidence. During the deposition, Dodson explained that he visited Williams's apartment the evening of the shooting to speak with Teasley about a music album Teasley had commissioned Dodson to produce. Dodson testified that he knew only Teasley, expressly denying that he knew any one else present at the shooting. Furthermore, Dodson stated that he would be unable to identify anyone present at the shooting besides Teasley because he was too frightened to pay attention to and note anyone's appearance.

According to Dodson, about two minutes after he arrived, two males approached the porch and asked Teasley, "'[W]hat's up man[?]'" whereupon Teasley instructed Dodson to "move back." After Dodson moved away a short distance, he observed one of the two assailants engage in a physical altercation with Teasley. When the pair had been fighting for about five minutes, Dodson observed one of the assailants draw a semi-automatic rifle from his coat, waive [sic] it around, and point it at Teasley. At about the same time, Dodson observed a man carrying a shotgun emerge from the apartment. Dodson explained that seeing the two armed men prompted him to flee. He took cover in a nearby breezeway, where he soon heard a series of rapidly fired shots, which he identified as semi-automatic gunfire. Although Dodson conceded he had never heard a shotgun blast, he insisted the shots he heard could not have been fired from a shotgun. Dodson also conceded that, because he was unable to see either the assailant or the victim from where he had taken cover, he did

not actually see anyone fire a gun.

Metro Nashville Police Department Officer James Patterson testified that, while on patrol, he was dispatched to 300 Settle Court to respond to reports of a shooting. When he arrived, he found emergency personnel attending to the victim. Officer Patterson also found Williams inside the apartment and escorted her away from the apartment to prevent the trauma of the crime scene from interfering with her ability to clearly describe the shooting. On cross-examination, Officer Patterson explained that he arrived at the scene of the shooting fewer than three minutes after being dispatched and was one of the first officers to arrive.

Metro Nashville Police Department Officer William Kirby of the identification crime scene section testified that he secured the scene of the shooting. Officer Kirby confirmed that upon arriving he found shell casings as well as the victim's blood and clothing near the doorway. After the scene was photographed, Officer Kirby prepared a crime scene diagram. Officer Kirby confirmed that eight photographs the State introduced accurately portrayed 300 Settle Court as he found it the day of the shooting.

Referring to the crime scene diagram that he prepared, Officer Kirby indicated the areas in which he found shell casings, bullet fragments, and a gold tooth. He found one .223 shell casing approximately eight feet from the doorway; two .223 shell casings approximately five feet from the doorway; and a group of twelve .223 shell casings as well as five bullet fragments in "the bloodiest area" immediately outside the doorway.

On cross-examination, Officer Kirby explained that, when he arrived, paramedics had already removed the victim from the scene but that two patrol officers remained on the scene while he completed his documentation. He then confirmed that he limited his investigation to the portion of a nearby drainage ditch abutting the porch, the porch itself, the breezeway, and the floor of the apartment immediately inside the door. However, Officer Kirby testified that he would have noted the presence of any holes in any portion of the surrounding drainage ditch where the assailants allegedly stood. He also testified that, although he indicated in his report that the twelve shell casings lying immediately outside the doorway were manufactured by Remmington, he could not recall whether the three other shell casings lying slightly farther from the doorway were also manufactured by Remmington. Officer Kirby conceded that the shell casings found five and eight feet from the door could

9

have been kicked off the porch by emergency personnel attending to the victim. Finally, he explained that he did not dust the shell casings for fingerprints because the heat generated when they were fired would have destroyed any print residue.

Metro Nashville Police Department Officer Michael L. Pyburn, a firearm and tool mark examiner, testified that he received and analyzed five discharged bullets or bullet fragments and fifteen discharged cartridge cases recovered from the shooting. Officer Pyburn concluded that all but one of the discharged bullets and bullet fragments were fired from the same unknown .223 caliber firearm. He explained that the fifth bullet fragment contained insufficient "identifying characteristics to convince [him] that it was discharged by the same firearm." Similarly, he concluded that all but one of the fifteen discharged cartridge cases were fired from the same unknown firearm. Officer Pyburn explained that, because the fifteenth cartridge case bore insufficient markings to analyze, he "ruled it inconclusive." He further explained that the cartridge's lack of markings might be due to the shooter's having held the gun "limp-wristed or one[-]handed as [the shooter was] running away." However, Officer Pyburn emphasized that, because the fifteenth cartridge case was .223 caliber, it could have been fired from the same firearm that discharged the other fourteen cartridges. Officer Pyburn also received and analyzed three bullets or projectiles retrieved from the victim's body. He concluded that each of the three bullets was fired from the same unknown firearm.

Officer Pyburn testified that someone, especially someone familiar with firearms, within hearing distance would be able to differentiate between shotgun and rifle fire. He explained the difference between the two sounds:

> A shotgun is more of a boom. . . . [Y]ou dont have the loud auto crack like you do with a rifle. Because a rifle bullet is moving faster than the speed of sound, where a shotgun you got a bunch of little pellets and they are coming out, they are not moving at the speed of sound, so you don't have that real sharp crack sound like you would with a high velocity rifle.

Officer Pyburn also described the material that would be present at the scene of the shooting had a shotgun been fired:

> If it was a shot shell you would have the empty hull, which

again, is just an empty cup. You would have an over powder wad, which is usually plastic or compressed cardboard, a cushioning wad, and what they call a shot cup or a shot collar, which is a piece of plastic that is designed to hold all the little pellets to keep them protected as it moves down the bore of the shotgun until it reaches the muzzle. Then the pellets continue on that velocity, the shot cup being much lighter drops off. That leaves your shot, all your pellets to continue down range and open up.

He clarified that the shotgun material would settle either down range or "within the target itself."

On cross-examination, Officer Pyburn testified that the smallest pellet a shotgun can discharge is known as "bird shot" and would be difficult to locate in a grassy area.

Michael L. Moss testified that he was a Metro Nashville Police Department homicide detective at the time of the shooting. Moss testified that on April 7, 2004, he was summoned to 300 Settle Court to investigate a shooting and that he was later assigned as lead investigator of the shooting. When Moss arrived at the scene at 9:30 p.m., some twenty minutes after he was dispatched, patrol officers had already taped off the crime scene, and emergency personnel had already removed the victim. Moss explained that, given the large amount of blood in and around the doorway, the victim probably had collapsed near the doorway. He confirmed that several photographs the State introduced accurately reflected the scene of the shooting. As to the evidence at the scene, Moss recalled that his team collected fifteen spent shell casings, each of which were .223 caliber, and five bullet fragments. He testified that he did not find any shotgun wadding and that there was no evidence of a shotgun blast at the crime scene.

Moss testified that he briefly interviewed Williams and Boyce at the scene and that neither divulged the [Petitioner's] identity. The day after the shooting, both Williams and Teasley separately picked the [Petitioner] out of a photo line-up as the shooter. On April 9, 2004, Boyce picked the [Petitioner] out of a photo line-up as the person Boyce had seen with a gun. Williams, Teasley, and Boyce each indicated to Moss that they were familiar with the [Petitioner] before the shooting. Moss explained that a witness, reluctant to identify a perpetrator in the presence of others, is usually more forthcoming in

11

a private setting.

On cross-examination, Moss reiterated that, when he arrived at the scene, the victim had already been removed, and approximately twelve officers were present. He testified that none of the officers entered the taped-off crime scene area, explaining that, because he "[doesn't] allow anybody to be inside that area," the officers "[knew] better than that." Moss conceded, however, that emergency personnel and witnesses probably freely moved about the crime scene before officers taped it off. Although Moss reiterated that he would have noted the discovery of a shotgun at the scene, he disclosed that he "seem[ed] to remember a shotgun in a corner [of the apartment], but [he] couldn't say for sure."

Dr. Feng Li, an assistant medical examiner for the Davidson County and Metro Nashville Medical Examiner's Office, testified that he performed an autopsy on the victim's body. From the autopsy, he concluded that multiple gunshot wounds were the victim's cause of death. He elaborated that, of the victim's nine total gunshot wounds, whole bullets caused six wounds, bullet fragments caused two wounds, and a grazing bullet caused one wound. Dr. Li testified that, because the victim's wounds contained neither soot material nor "powder tattooing," the shooter must have been more than two-and-a-half feet away from the victim.

On cross-examination, Dr. Li said that he was unable to determine the wounds' sequence of infliction. Also, Dr. Li testified that he did not test the victim's hand for gunshot residue, because he was unsure whether the victim's body had been cleaned. He explained that, although soot material can be cleaned from the skin, powder tattooing is buried underneath the skin and cannot be cleaned off.

*Williams*, 2009 WL 564231, at *1-9. The jury convicted the Petitioner of first degree premeditated murder, aggravated assault, and felony reckless endangerment. The trial court imposed a life sentence for the first degree murder conviction, a concurrent two-year sentence for the felony reckless endangerment conviction, and a consecutive six-year sentence for the aggravated assault conviction, to be served in the Tennessee Department of Correction.

### B. Post-Conviction Hearing

The Petitioner filed a petition for post-conviction relief, claiming that he received the

ineffective assistance of counsel and alleging prosecutorial misconduct. The Petitioner alleged that his attorney ("Counsel") was ineffective for failing to adequately investigate the Petitioner's case; failing to communicate with the Petitioner; failing to request a pre-trial hearing; failing to introduce into evidence photographs of the Petitioner's injuries; failing to adequately cross-examine police officers; and presenting impossible theories of defense.

The post-conviction court held an evidentiary hearing, and it heard the following evidence: the Petitioner testified that Counsel was appointed to represent the Petitioner at his arraignment. He testified that he told Counsel at their first meeting that this was a "self-defense case[.]" The Petitioner told Counsel that a "guy" had "come out on me with a shotgun" and had shot at the Petitioner and that the Petitioner had "always" maintained that he "shot back" after first being "shot at[.]" He testified that pictures of his injuries were taken by Dianne Turner, his counsel during the proceedings in General Sessions Court. The Petitioner stated that Ms. Turner took the pictures of pellet wounds in his leg when he was "first locked up," and that he showed the photographs to Counsel, and they discussed them. The Petitioner stated that Counsel said he was going to use the photographs as evidence, but they did not discuss whether they would be introduced at trial. The Petitioner recalled that the photographs were not in fact introduced at trial.

The Petitioner testified that he met with Counsel "regularly," about five or six times. He stated that Counsel provided him with the discovery furnished by the State and that he reviewed the discovery materials with Counsel. The Petitioner stated that he had an "opportunity to review the basic facts of the case and the evidence and discuss it with [Counsel.]" The Petitioner testified that he did not "comprehend" the discovery materials. The Petitioner testified that Counsel conveyed the State's plea agreement offer, a seventeen-year sentence to be served at 100%, but that he did not want to take the offer. He stated that he understood he was charged with first degree murder and that a conviction could result in a life sentence. The Petitioner stated that Counsel did not give his opinion about whether the Petitioner should take the State's offer.

The Petitioner testified that Counsel was aware of the Petitioner's position that he was fired upon first. He recalled that Counsel told him, if he testified, the State would bring up his criminal record which, "wouldn't be a good thing." The Petitioner said he was relying on Counsel for guidance about whether he should testify. The Petitioner said he did not understand that the photographs of his injuries might not be admissible at trial without his testimony or that the jury might then never see the photographs.

The Petitioner recalled that Counsel made him believe that Batiste was going to testify against him, but that the Petitioner saw Batiste in jail, and Batiste told him he planned to testify for the Petitioner. He stated that he never had a discussion with Counsel about his

13

conversation with Batiste.

On cross-examination, the Petitioner agreed that Counsel had not said the Petitioner could not testify at trial. The Petitioner recalled that Counsel told him it would not "be a good idea . . . because [the State] would bring up [his] record." He agreed that his prior criminal record contained "a couple" of convictions for aggravated assault and convictions for felon in possession of a weapon.

The Petitioner agreed that, when the incidents in this case occurred, he was a felon in possession of an assault weapon. The Petitioner agreed that, during these incidents, he fired fifteen shots, eight of which ended up in the victim's body. He also agreed that his injuries were not serious enough to send him to the hospital. He testified that he was carrying an assault weapon "for protection" and that sometimes he carried a handgun.

The Petitioner testified that, if he would have known "certain things" at trial, he would have made different decisions about the course of the trial. The Petitioner maintained that he relied on Counsel's advice. He stated that he did not get a "solid view" of what to expect at trial and what not to expect. The Petitioner said the outcome of his case would have been different if he had testified and been able to introduce the photographs of his injuries.

Counsel testified that he was appointed by the criminal court to represent the Petitioner at trial. He agreed that the Petitioner raised the issue of self-defense but that Counsel did not "approach" the case as a self-defense case, because "[the Petitioner's] definition of self-defense did not meet the legal definition of self-defense." He said that he explained to the Petitioner why his version of the events would not "fly" as a self-defense argument, given that "[the Petitioner] was [at the scene] in some sort of offense brawl." Counsel recalled that he went "around and around" in discussion with the Petitioner about the self-defense claim, and discussed it "inside and out." Counsel stated that, "It's kind of hard to claim self-defense when [the Petitioner] is there on someone else's property aiming a rifle at him and his friends."

Counsel recalled that he and the Petitioner discussed "at length" whether the Petitioner would testify. He said that the Petitioner "refused to testify," and that every time Counsel brought up the subject of testifying with the Petitioner, he responded, "I'm not testifying, I'm not getting on the stand." Counsel recalled the Petitioner said this at least ten times and would not discuss with Counsel the fact of whether or not he would testify. Counsel recalled that he advised the Petitioner that, if he did testify, the Petitioner's criminal record would "be a problem" but that he said it was up to the Petitioner. Counsel "absolutely disagree[d]" with the Petitioner's recollection of their discussions and said he "did not discourage [the Petitioner]" from testifying.

14

Counsel testified that he told the Petitioner that the only "evidence" of him getting shot would come from the Petitioner and that no other witness would testify to that, so the Petitioner would have to rely on his own testimony to show that he acted in self-defense. Counsel testified that he had a discussion with the Petitioner and Ms. Turner about the photographs she had taken of the Petitioner's injuries; Counsel stated that there was an authentication problem with the photographs because it was not self-evident from the photographs that the injuries were in fact shotgun wounds or when the Petitioner had sustained the injuries. Thus, Counsel stated that the photographs would "require an explanation" from the Petitioner, and he testified that he had planned to call Ms. Turner as a witness "if there was any way to get [the photographs] in [to the record.]"

Counsel reiterated that "[l]egally the law did not support [the Petitioner's] position of self-defense" but, had the Petitioner testified, Counsel would have introduced the photographs. Counsel agreed that there was some evidence at trial that a shotgun had been found at the scene of the crime, but he did not recall getting a result report from a fingerprint analysis done on the shotgun to determine whether the victim's or any other witness's fingerprints were on the shotgun. Counsel also agreed that, had the victim's fingerprints been found on the shotgun, the fact would have supported the Petitioner's version of the story. He said, however, that, without the Petitioner testifying, it would not have "supported a lot." Counsel agreed he did not subpoena the shotgun or present it into evidence.

On cross-examination, Counsel said he had been practicing law for six years at the time of the trial and that he had tried "[m]any" criminal cases at the time. Counsel recalled that the issue at trial was not whether or not a shotgun had been present at the scene in the hands of the victim, but the issue was whether the "shotgun had actually been used as an offensive weapon by the victim toward the [Petitioner.]" Counsel agreed that another witness had testified that a shotgun had been present at the scene in the hands of the victim and "may" have been used. Counsel also agreed that he had requested that the jury be charged with the theory of self-defense.

Counsel testified that the assault weapon in the Petitioner's possession was "a big problem" for the self-defense theory and that the theory was a "very tough sale" to a jury. Counsel said that he "went over the pros and cons" of testifying with the Petitioner and that the Petitioner "never hinted" he wanted to testify, and in fact was "adamant" that he would not testify.

Regarding the State's plea agreement offer, Counsel recalled that the Petitioner "flatly rejected" the State's offer for him to plea to second degree murder and that the Petitioner's mother had told him not to take the offer. Counsel stated that he advised the Petitioner to really consider the offer, but the Petitioner did not want to "take anything." Counsel

15

identified a document titled a "Momon Advice Waiver" with the Petitioner's signature on it, and he explained it was the "standard [form] that this court used in its trials when a defendant chooses not to testify."

Based upon this testimony, the post-conviction court denied post-conviction relief. The post-conviction court, in its order, found Counsel's testimony credible, and found that the Petitioner's record of felony convictions "significantly compromised" his credibility. The post-conviction court further stated, citing Tennessee Code Annotated section 39-11-611(d), that the evidence presented at trial that the Petitioner showed up to the crime scene waving an assault rifle, prior to any alleged showing of force by the victim, making the Petitioner the "first aggressor and therefore [forfeiting] any potential claim to self-defense." The post-conviction court found that the argument related to the admission of the shotgun into evidence "would [not] have made any difference in the outcome of the case," and thus, Counsel was not ineffective for failing to present the shotgun as evidence. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition because: (1) Counsel failed to properly analyze or present the Petitioner's claim of self-defense; (2) Counsel failed to introduce into evidence the photographs of the Petitioner's injuries; and (3) Counsel failed to subpoena the shotgun recovered at the scene. The State responds that the Petitioner's "own refusal" to testify was "fatal" to any self-defense theory and that the Petitioner's assertion of Counsel's dismissal of his theory of self-defense is not supported by the record. The State further argues that Counsel's failure to introduce the photographs was not error because they added "nothing" without the Petitioner's explanation through testimony. The State lastly argues that the Petitioner has not shown how the introduction into evidence of the shotgun would have impacted the trial proceedings. The State contends that the Petitioner did not show deficient performance by Counsel or prejudice, and thus, the post-conviction court properly denied the Petitioner post-conviction relief. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon our review, the trial judge's findings of fact are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus,

16

this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be

highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In its order denying the Petitioner relief on this issue, the post-conviction court accredited Counsel's testimony that he had thoroughly discussed the case with the Petitioner, explained all the evidence to him, advised him on the issue of whether to testify, and that the Petitioner was adamant that he would not testify. The post-conviction court found that, based on the evidence that the Petitioner had arrived at the crime scene with an assault rifle and the lack of evidence that the victim was the first aggressor, the Petitioner's theory of self-defense was not available to him. The post-conviction court noted that there was no evidence at trial that a shotgun had ever been fired, by the victim or anyone else, and thus the trial court found that the admission of the shotgun would not have changed the outcome of the trial.

The evidence in this case does not preponderate against the post-conviction court's findings on these matters. The Petitioner agreed that he arrived at the scene where the shooting took place brandishing a semi-automatic weapon. The Petitioner also agreed that he had prior felony convictions, and that he was not permitted to be in possession of a weapon. Additionally, no evidence was presented that the victim was the initial aggressor. Thus, the evidence does not preponderate against the post-conviction court's finding that the theory of self-defense was not supported by the evidence and that Counsel was not

18

ineffective for further presenting the same.  *See* T.C.A. § 39-11-611(d), (e) (2010).

Counsel testified, and the post-conviction court accredited his testimony, that he spoke with the Petitioner at length about testifying in his own defense, and that Counsel believed that the photographs of the Petitioner's injuries would be admissible only through his testimony, as the photographs did not indicate how or when the injuries depicted occurred. The post-conviction court agreed, noting that there was "no reliable indication of when or how the [Petitioner's] injur[ies] occurred."  We agree that, as there was no evidence presented that the Petitioner was ever shot by a shotgun at the scene, Counsel did not have a witness through which to introduce the photographs of the purported shotgun pellet wounds.  The evidence does not preponderate against the post-conviction court's finding that Counsel was not ineffective for failing to introduce the photographs.

Regarding the admissibility of the shotgun recovered at the scene, the post-conviction court found that Counsel's failure to introduce it at trial "would [not] have made any difference in the outcome of the case," as there was no evidence of it being fired, and "no sign of wadding, buckshot fragments or damage to any property that could have been caused by a shotgun."  The post-conviction court noted that witnesses testified to rapid-fire shots, consistent with an automatic assault rifle, but did not testify to shotgun blasts.  We agree that there was no testimony by witnesses that the shotgun was fired, and no testimony by any crime scene investigator that shotgun shells or damage was found at the scene.  Thus, the evidence does not preponderate against the post-conviction court's findings that the introduction of the shotgun would not have changed the outcome of the trial.

The Petitioner has not shown by clear and convincing evidence that Counsel's representation fell outside of the range of competence demanded of attorneys in criminal cases.  Accordingly, the evidence in the record does not preponderate against the post-conviction court's judgment.  Thus, the Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied relief.  Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE

19